IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Judge

Civil Action No. 13-cv-01632-LTB-NYW

JEFFREY WASHINGTON,

    Plaintiff,

v.

BOARD OF TRUSTEES OF METROPOLITAN STATE UNIVERSITY OF DENVER,

    Defendant.

___

ORDER
___

    This case is before me on Defendant's Motion for Summary Judgment [Doc # 27]. After consideration of the motion, all related pleadings, and the case file, I deny Defendant's motion.

## I. Facts

    The following facts are undisputed for purposes of Defendant's motion unless otherwise noted.

    Plaintiff Jeffrey Washington ("Washington"), an African American, was a student at Metropolitan State University of Denver ("Metro State") from 2008 through the filing of Defendant's Motion. Motion, pp. 1-2; Response, p. 2. Metro State is one of the constituent institutions of the Auraria Higher Education Center ("AHEC") in Denver.

    Washington first held office with Metro State's Student Government Assembly ("SGA") beginning in September of 2010 when the then- SGA president appointed him to a vacant student senate seat. Motion, p. 2; Response, p. 2. Washington then ran in and won a special election in January of 2011 and served in the student senate until January of 2012. *Id.*

In January of 2012, Washington decided to run for SGA president and chose S.H., a Caucasian, as his running mate. *Id.* At that time, A.M., another student at Metro State, was the Chairperson of the Election Commission. *Id.* Three other Metro State students also served on the Election Commission, and Jake Kasper, who worked in Metro State's administration, served as an advisor to the Election Commission. *Id.* There were no African American members of the Election Commission at the time of the 2012 election. Response, p. 9; Reply, p. 7.

In January and February of 2012, Washington and S.H. met with A.M. and the Election Commission. Motion, pp. 2-3; Response, pp. 2-3. During Washington's meeting with A.M., they discussed the Elections Code which would govern the SGA elections. Motion, p. 3; Response, p. 2. Washington was involved in the writing and approval of the Code while serving in the student senate and understood that he would be disqualified if he was found to have committed three minor violations. *Id.* S.H. was likewise involved in the approval of the Elections Code. *Id.* During one of these meetings in early 2012, Washington and S.H. were given ACEH's policies and requirements for campaign posters, and they prepared posters in accordance with them around this same time. Response, p. 9; Reply, p. 7.

The Elections Code provided that

> The Commission shall disqualify a campaigner from further participation in campaigning or in the election itself only upon a finding that the campaigner has committed three separate minor violations, a repetition of two identical minor violations, or one major violation.

Ex. 3 to Motion, § 6.04.02. The Elections Code defined a "minor violation" as

> ... one that may impact fair election procedures. Minor violations may not cause harm to the election process and may include remediable actions. Minor violations do not require proven harm, but only evidence in opposition to this Code as written. Failure to be aware of applicable rules and codes shall not be considered a defense to an alleged violation.

*Id.* at § 1.01.25(b).

On March 28, 2012, A.M. issued Washington and S.H. a written violation for using SGA resources for the purpose of campaigning. Ex. 4 to Motion. On April 4, 2012, the Election Commission found that "it was more likely than not that [Washington] was utilizing the resources of the SGA offices for the purposes of campaigning in violation of § 5.03.4 of the Elections Code" and thereby committed a first minor violation. *Id.* Washington did not contest the Election Commission's findings and pled guilty to the violation. Motion, pp. 4-5, Response, p. 4.

On March 29, 2012, A.M. sent an email advising SGA candidates that all communications with AHEC should be funneled through her and sent via the Commission. Ex. 5 to Motion. A.M. further advised that 5 days - April 9, 10, 13, 16, and 20, 2012 - had been set aside for candidate tabling on a first come, first serve basis. *Id.* Washington asserts that he and S.H. were previously told that they could set up a table and campaign any day during election week. Ex. 1 to Response, p. 80.

The Policies and Procedures for ACEH's Campus Events Services provide that tables reserved to promote or disseminate information about student clubs or campus departments"must have a sign attached ... (in clear view, not smaller than 8 ½" x 11"), identifying the student organization or campus department and a contact phone number" and that "student organizations/campus departments may not "front" for other organizations in any manner." Ex 7 to Motion, ¶¶ 3 & 4.

S.H. reserved a table directly from AHEC for April 17, 2012. Motion, p. 5, Response, p. 4. The reservation references the Metro State Latter-Day Saints Student Association after S.H.'s

name and also references "Elections." Ex. 6 to Motion. On April 17, 2012, some of S.H.'s children were observed standing behind a table on the AHEC campus. Motion, p. 6; Response, p. 4. The table contained campaign materials and a sign prominently endorsing Washington and S.H.'s campaign. *Id.* There was no sign at the table identifying the Metro State Latter-Day Saints Student Association. *Id.*

On April 18, 2012, following a hearing, the Election Commission found that Washington and S.H. utilized an unauthorized table on the Auraria campus grounds for campaign purposes in violation of § 5.05.1 of the Elections Code which states:

> All parties to an election shall be responsible for full compliance with this Code, all college and campus policies relevant to election proceedings and all state and federal laws applicable to conduct within such proceedings. However, violation shall only be determined by the Commission upon a finding of clear intent and/or failure to be aware of applicable rules.

Ex. 8 to Motion. This was Washington and S.H.'s second minor violation. *Id.*

By email dated March 6, 2012, A.M. provided SGA candidates with a sample border and advised them to "use the border if you are going to make a poster." Ex. 9 to Motion. A.M. sent at least two other emails dated March 27, 2012, and April 10, 2012 referencing the border requirement. Ex. 10 & 11 to Motion. A.M.'s April 10, 2012 email further advised that failure to abide by the border requirement "will be treated as a violation from this point forth." Ex. 11 to Motion. The ACEH policies and requirements for campaign posters that A.M. gave Washington and S.H. in February of 2012 did not reference a border requirement. Response, p. 9; Reply, p. 7.

On April 18, 2012, campaign posters belonging to Washington and S.H. that lacked the required border were found in the physical education building. Motion, p. 8, Response, p. 5.

The posters had been prepared prior to A.M.'s emails addressing the border requirement. Reponse, p. 9; Reply, p.7.  Washington asserts that another student, J.A., also printed and posted campaign posters without the required border.  Ex. 1 to Response, p. 42.  Washington further asserts that he provided A.M. with a photo of J.A.'s poster but that, to his knowledge, she did nothing in response.  *Id.*

On or about April 22, 2012, the election results were tabulated and Washington and S.H. won the majority of votes with 582.  *Id.*  The runners-up were L.N. and A.S. with 446 votes.  *Id.*  On April 23, 2012, the Election Commission held a hearing and found that Washington and S.H. had violated the Commission's requirements for campaign posters.  Ex. 12 to Motion.  On April 25, 2012, the Election Commission unanimously voted to disqualify Washington and S.H. because they committed three minor violations.  Ex. 14 to Motion.  The Commission's administration advisors abstained from voting on the disqualification.  *Id.*

On April 26, 2012, Washington and S.H. filed an appeal of the Election Commission's disqualification decision with the Student Court.  Ex. 15 to Motion.  Per the SGA's Constitution, "[a]ll rulings by the Student Court are final and binding on the SGA and shall be duly enforced by the President and adhered to by the Senate and all other governmental entities."  Ex. 4 to Response, SGA Constitution, Article VIII, § 3(3).  Washington asserts that in his experience serving on the SGA, Metro State's administration honored the decisions of the Student Court. Ex 1 to Response, 168:6-13.

On May 8, 2015, the Student Court released its opinion finding, among other things, that it was not proven that Washington and S.H. had three separate violations as opposed to one and a half each; that there was "a lack of a preponderance of the evidence" that Washington and S.H.

had violated posting policies for campaign posters or campaigned in the SGA office; and that the Election Commission had failed to remain impartial "due to incorrect voting procedures." *Id.* In response to the Student Court's opinion, the Election Commission issued a decision stating that the Student Court may not make findings of fact regarding elections violations; did not have supremacy over decisions regarding elections; did not have jurisdiction to override elections codes; and that the disqualification of Washington and S.H. from the 2012 election would stand. Ex. 19 to Motion.

On May 11, 2012, A.M. advised candidates via email that the election had not been certified and that the "[a]dministration has chosen to look into some matters pertaining to the election." Ex. 16 to Motion. On May 18, 2012, the Chief Justice of the Student Court issued a "temporary order" to the Election Commission ordering them to certify the election results. Ex. 17 to Motion. The Chief Justice issued a second "temporary order" to the same general effect on May 25, 2012. Ex. 18 to Motion.

On May 30, 2012, then-SGA President, J.A. released a "Notice of Executive Decision" indicating that he would not enforce the Student Court decision due to its "unconstitutional nature." Ex. 20 to Motion. The Election Commission subsequently certified L.N. and A.S. as the winners of the 2012 Spring Elections for SGA president and vice president. Ex. 21 to Motion.

Washington filed a discrimination complaint with the Metro State's Office of Equal Opportunity ("EO Office") asserting

> Because of the history of African American [sic] being disqualified from student government after they have been elected student body president[,] I think it is reasonable to ask that an investigation be launched to find out if whether [sic] [Washington] is being harassed because of his race and the position he was

> elected to hold as student body president of Metro State, which no other African American has been able to serve as for a full term.

Ex. 22 to Motion. Washington identified Amelia Paul and Jake Kasper as the parties who engaged in discrimination but does not know if these individuals did anything to affect the decision of the Election Commission. *Id.*; Motion, p. 10, Response, p. 8. Percy Morehouse, Executive Director of the EO Office determined that Washington had not provided any corroborating evidence to substantiate his discrimination claim against Paul and Kasper and dismissed the claim. Ex. 23 to Motion.

On June 1, 2012, Vicki Golich, the Provost and Vice President for Academic & Student Affair, sent a letter to SGA members stating:

> The College is aware of the escalating dispute regarding the outcome of the SGA elections held last month in relation to the offices of President and Vice President. While the College encourages the incoming leadership of the SGA to resolve this dispute in an appropriate and amicable fashion, until such time as the College is notified of an otherwise reasonable resolution, it will proceed according to longstanding precedent. In the past, student life staff have accepted the certification of the election commission as to the duly elected officers of the SGA and has conveyed that information to the College for various purposes including the processing of employment paperwork and payment of salary stipends. The College will proceed accordingly as it has now been advised of the Commission's certification.

Ex. 24 to Motion. Washington and S.H. requested a meeting with Golich but she declined stating that "what was stated in my letter of June 1 to the [SGA] stands." Ex. 25 to Motion.

Washington, S.H., and M.F. attended the Board of Trustees meeting on June 7, 2012 and asked for the Board's assistance in resolving the election dispute. Motion, p. 12; Response, p. 8. The Board declined to take any action. *Id.* Washington then requested a meeting with Metro State President, Stephen Jordan. *Id.* A meeting between Washington, Jordan, Golich,

Morehouse, and SGA representatives took place on June 27, 2012, but no further action was taken. *Id.*

The SGA president position pays a stipend of approximately $1,200 per month or a total of approximately $15,600 for fifteen months. *Id.* Two African American students previously served as SGA president but were removed from office prior to completion of their terms of office for violations of the student code of conduct. Response, p. 10; Reply, p. 10.

## II.  Standard of Review

The purpose of a summary judgment motion under Rule 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual

issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed. R. Civ. P. 56(e).

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson*, 477 U.S. at 252; *Mares*, 0971 F.2d at 494.

### III. Analysis

Title VII discrimination claims predicated on indirect or circumstantial evidence are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1225 (10th Cir. 2000). Under this framework, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination. *Id.* (*citing McDonnell Douglas,* 411 U.S. at 802). Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* (*citing McDonnell Douglas,* 411 U.S. at 804). If the defendant makes this showing, the burden shifts back to the plaintiff to show that the defendant's proffered reasons is pretextual. *Id.*

To meet the initial burden of making out a prima facie case of discrimination under Title VII, a plaintiff must show (1) membership in a protected class; (2) an adverse employment

action; and (3) disparate treatment among similarly situated employees. *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir. 2005). A Title VII's burden in articulating a prima facie case is "not onerous" but "slight." *Id.* (citations omitted). In the summary judgment context, a Title VII plaintiff must, at a minimum, demonstrate that there is a genuine issue of material fact as to their prima facie claim of discrimination. *Id.*

Defendant argues that Washington cannot demonstrate the third element of his prima facie case, *i.e.*, disparate treatment among similarly situated employees. To satisfy this element, Washington need only show that at least one other similarly situated employee was treated more favorably. *Id.* at 1153. This Washington has done through his allegations that another candidate in the SGA 2012 elections also printed and posted campaign posters that did not meet the border requirement and that no actions were taken against him. Had Washington not been issued a minor violation for non-complying campaign posters, he would not have had the three minor violations that resulted in his disqualification. Under these circumstances, Washington has at least raised a genuine issue of material fact as to whether other similarly situated employees were treated more favorably. In reaching this conclusion, I do not rely on evidence that the only other African American students elected to SGA President were removed from office since there is no evidence that any non-African American students elected to this position were permitted to remain in office despite the same or similar allegations against them.

Defendant also argues that Washington cannot meet his burden of showing that its proffered reason for disqualifying him from the 2012 SGA elections, *i.e.,* that he and S.H. committed three minor campaign violations and Metro State's administration chose not to intervene, is pretextual. I disagree.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1158 (10th Cir. 2008) (*quoting Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997)). "Pretext can be shown in a variety of ways, including but not limited to differential treatment of similarly situated employees and procedural irregularities." *Id.* The same evidence used to establish the plaintiff's prima facie case may be used to establish pretext. *Id.* at 1155. Again, in the summary judgment context, a Title VII plaintiff need only demonstrate a genuine dispute of material as to whether the proffered reasons are unworthy of belief. *Id.* at 1158 (*citing Morgan, supra*).

Washington's experience with how Metro State's administration previously treated decisions of the Student Court is evidence of procedural irregularities in connection with his disqualification from the 2012 SGA elections. Washington's allegations that another candidate in the SGA 2012 elections was not issued a minor violation for printing and posting campaign posters that did not meet the border requirement is further evidence to support a finding of pretext. Washington has therefore raised a genuine issue of material fact as to whether Metro State's proffered reasons for disqualifying him from the 2012 SGA elections are pretextual. In reaching this conclusion, I again do not rely on evidence that the only other African American students elected to SGA President were removed from office since there is no evidence to establish a nexus between such removal and Plaintiff's disqualification. *See Heno v. Strpint/United Management, Inc.,* 308 F.3d 847, 856 (10th Cir. 2000) (prior incidences of

alleged discrimination are only admissible if they can be tied to the adverse actions at issue through involvement by the same decision makers and temporal proximity).

## IV.  Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Doc # 27] is DENIED.

Dated: April __14__, 2015 in Denver, Colorado.

                                            BY THE COURT:

                                            s/Lewis T. Babcock
                                            LEWIS T. BABCOCK, JUDGE